UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X

JOHN WOODBERRY,

                           Plaintiff,

                 -v-

FORD GRAHAM et al.,

                       Defendants.

-------------------------------------------------------------- X

|  |
|---|
| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: <u>January 13, 2017</u> |

14-cv-04816 (KBF)

<u>OPINION & ORDER</u>

KATHERINE B. FORREST, District Judge:

      This is a breach of contract and fraud action. This Opinion & Order resolves plaintiff's pending motion for summary judgment at ECF No. 70 as to all claims. For the reasons set forth below, the Court GRANTS summary judgment as to Count I (on consent) and DENIES it as to all other counts. This matter shall proceed expeditiously to trial.

I.    PROCEDURAL HISTORY[1]

      This action was filed on June 27, 2014. (ECF Nos.1, 2.) It was transferred to the undersigned on November 1, 2016. The Complaint makes claims against a number of defendant entities, including Ford Graham, Cogent Offshore Ltd., Ginsters Services and Investment Ltd., Greenhill Offshore Ltd., Greenstone Ltd., JMF Offshore Ltd., Nassau Media Ltd., Vulcan Energy International, LLC, Vulcan Holdings Limited, LLC, Vulcan Minerals and Power, Ltd., Vulcan Petroleum

---

[1] This case was reassigned to the undersigned on November l, 2016.

Resources Ltd., Vulcan Power Services Ltd., Vulcan Water Resources, Ltd., Westbridge Fuels Ltd., the Ford Graham Annuity Trust No. 2, the Ford Graham Annuity Trust No. 7, and Katherine Graham in her capacity as Trustee and representative of the Ford Graham Annuity Trusts.  (ECF No. 2.)  Defendants answered on September 4, 2014.  (ECF No. 25.)[2]  Following the conclusion of discovery, plaintiff brought the instant motion for summary judgment as to all claims.  (ECF No. 70.)

Defendants concede liability for the breach of contract asserted in Count I (relating to a security agreement discussed below) but oppose the motion in all other respects.  (Def. Brief in Opp. at 1, ECF No. 72 at 4.)

II.    FACTS

The following facts are undisputed unless otherwise noted.

The dispute between the parties concerns two related contractual arrangements: a security agreement ("Security Agreement") relating to certain equipment ("Project Equipment"), and an option agreement ("Option Agreement"), relating to various investments.  The Complaint contains four counts.  Count One (to which defendants have conceded liability), asserts a claim against the

---

[2] The answer in this action was filed on behalf of all defendants.  The docket incorrectly reflects a notice of appearance for only three of the defendants (Ford Graham, Vulcan Holdings Limited LLC, and Westbridge Fuels Ltd.).  The Court will separately direct the Clerk of Court to note an appearance of counsel on behalf of all defendants.

Graham Entities[3] for breach of the Security Agreement, (Compl. at 10); Count Two asserts a claim against the "Vulcan Parties,"[4] (Id. at 11); Count Three asserts a claim for Fraudulent Inducement against "Graham and Vulcan Energy," (Id. at 11-12); and Count Four asserts a claim for Fraudulent Misrepresentation against "Graham and Vulcan Energy," (Id. at 12-13).

A.    The Security Agreement

On March 7, 2012, Vulcan Energy, Vulcan Holdings, the Ford Graham Annuity Trust No.2, the Ford Graham Annuity Trust No. 7, and Ford Graham (the "Graham Entities"), and plaintiff John Woodbury, entered into a Project Development and Security Agreement (the "Security Agreement").  (Pl. Rule 56.1 Statement of Material Facts ("SOF") ¶ 1, ECF No. 69-1 at 3.)  The Security Agreement was retroactive, with an effective date of October 4, 2010.  (Id.)  The Security Agreement provided that the Graham Entities agreed to pledge certain equipment as collateral, with a first priority security interest, for repayment of amounts provided to them by plaintiff Woodbury beginning in 2010.[5]  (SOF ¶¶ 2-5; Compl. Ex. A at Sch. 1, ECF No. 2-1 at 10.)  The amount due and owing is referred to throughout the Security Agreement as "Development Costs."  (SOF ¶ 2.) Particularly pertinent to this dispute are the representations and warranties ("reps

---

[3] The Graham Entities are defined as Ford Graham, Vulcan Energy International, LLC ("Vulcan Energy"), Vulcan Holdings Limited, LLC ("Vulcan Holdings"), and the Ford Graham Annuity Trusts Nos. 2 and 7.  (Compl. ¶ 1.)
[4] The Vulcan Parties are defined as Cogent Offshore Ltd., Ginsters Services and Investment Ltd., Greenhill Offshore Ltd., Greenstone Ltd., JMF Offshore Ltd., Nassau Media Ltd., Vulcan Minerals and Power Ltd., and Westbridge Fuels Ltd.  (Compl. ¶ 35.)
[5] The equipment at issue is defined as "Project Equipment" and includes "[t]he generator, turbine, air handling unit and other equipment located at 11518 Old LaPorte Road, LaPorte, Texas 77571 and 1227 Bushong, Houston, Texas 77574 . . . ."  (SOF ¶ 7) (alterations in original).

and warranties") set forth in Article 3 of the Security Agreement.  The reps and

warranties provide, <u>inter alia</u>:

> 3.3 <u>Litigation</u>.  No suit, action, litigation, administrative
> hearing, arbitration, negotiation or other proceeding or
> governmental inquiry or (to its knowledge) investigation
> affecting it or its property or assets is pending or, to its
> knowledge, threatened that would have a material
> adverse effect on any Obligor's ability to consummate the
> transactions contemplated by this Agreement.

> 3.4 <u>Solvency</u>.  (a) The fair value of the property and assets
> of each Obligor is greater than the total amount of
> liabilities, including contingent liabilities of such Obligor;
> (b) the present fair salable value of the assets of each
> Obligor is not less than the amount that will be required
> to pay the probable liability of such Obligor on its debts as
> they become absolute and mature . . . .

> 3.5 <u>Collateral</u>.  Each Obligor is the sole owner and shall
> continue to be the sole owner of all of the Collateral
> pledged by such Obligor free and clear of liens, claims and
> other encumbrances. . . .

(Compl. Ex. A at S-4.)  The Security Agreement also contains a standard integration

clause:

> 5.3. <u>Complete Agreement; Amendment; Termination</u>.
> This Agreement supersedes all prior agreements and
> understandings whether written or oral, between the
> Parties with respect to its subject matter, and constitutes
> a complete and exclusive statement of the terms of the
> agreement between the Parties with respect to its subject
> matter.

(<u>Id.</u> at S-6.)  Finally, the Security Agreement provides for a Limitation on Liability:

> 5.8 <u>Limitation on Liability</u>. . . .  NEITHER PARTY
> SHALL BE LIABLE OR HAVE ANY RESPONSIBILITY
> TO THE OTHER PARTY UNDER THIS AGREEMENT
> FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL,
> PUNITIVE OR EXEMPLARY DAMAGES . . . .  THE

4

LIMTIATIONS ON LIABILITY CONTAINED IN THIS
SECTION SHALL APPLY TO ANY CLAIM OR ACTION
REGARDLESS OF THE THEORY OF LIABILITY ON
WHICH IT IS BASED.

(Id. at S-7.)  Repayment of the Development Costs was required on or before August 31, 2012.  (SOF ¶ 8.)  It is undisputed that the defendant Obligors did not and have not repaid the Development Costs. (SOF ¶ 11.)

It is undisputed that during the negotiations of the Security Agreement, Ford Graham represented to Woodbury that the Project Equipment was worth more than the principal amount of the loan (otherwise referred to as the Development Costs).[6] (SOF ¶ 28.)  The parties further concede that this representation was made on behalf of Ford Graham himself as well as the "Graham Entities." (Id. ¶ 30.)

Plaintiff asserts that the Project Equipment has not been properly stored or maintained since its arrival at the LaPorte facility, and that from sometime commencing at least in the summer of 2010, the Project Equipment was stored out of doors, uncovered, and otherwise not properly maintained.  (SOF ¶¶ 32, 33, 36.)  Plaintiff further asserts that usual and customary preventative storage maintenance was not performed.  (SOF ¶ 35.)  Plaintiff also asserts that the equipment is now covered in rust and corroded.  (SOF ¶¶ 37, 38.)  Defendants dispute these assertions.  (SOF ¶¶ 32, 33, 35-38.)  Plaintiff further asserts that "[t]he substantial corrosion and other deterioration of the Project Equipment has been present since at least 2011 or early 2012."  (SOF ¶ 41.)  Defendants dispute

---

[6] While the parties dispute the precise amount of the Development Costs, they both agree they are in an amount of around $2 million.

5

this assertion.  (Id.)  Plaintiff contends that various parts are currently missing from the Project Equipment.  (See, e.g., SOF ¶¶ 42-45.)  Defendants respond that they can neither admit nor deny the current condition of the Project Equipment as the last inspection was in 2014.  (Id.)

Plaintiff contends that the costs of replacing the missing parts and otherwise restoring the Project Equipment exceeds its market value.  (SOF ¶ 50.)  Defendants deny this assertion.  (Id.)  The parties dispute whether the Project Equipment can be sold "as is" or not.  (Id. ¶ 52.)

Plaintiff contends that at the time the Ford Graham was negotiating the Security Agreement, he knew that the Project Equipment was worth less than the amount funded in the Security Agreement.  (Id. ¶ 61.)  Defendants dispute this assertion.  (Id.)

Plaintiff asserts that despite their representation to the contrary, at the time the Graham Entities executed the Security Agreement, PlainsCapital Bank held a lien on Vulcan Energy's assets, including the Project Equipment.  (Id. ¶ 66.)  In particular, plaintiff asserts that Grover Scott Campbell, who served as the vice president and financial director of Vulcan Energy until May 2010, and also served as the operations and finance manager of several other Vulcan entities, knew that PlainsCapital Bank had a lien on several Vulcan entities' assets.  (Id. ¶¶ 67-69.)  Defendants dispute that PlainsCapital Bank ever held a valid lien on the Project Equipment and instead contend that it had a lien on other equipment located in

Elizabethtown, North Carolina, relating to a company called Vulcan AMPS.  (SOF ¶¶ 66, 71-72.)  The parties are in agreement that PlainsCapital Bank eventually seized assets of Vulcan AMPS.  (Id. ¶ 71.)

The parties agree that, separate and apart from the PlainsCapital issues, Vulcan Energy filed an action in Texas in 2011 seeking to enjoin a third party's assertion of ownership of the Project Equipment.  (Id. ¶ 77.)  The third party was an entity called Technical Assets Power Management Group ("TAPMG") with a President and CEO by the name of John McVea.  (Id. ¶¶ 77, 80.)  That lawsuit was resolved in March 2014 by way of a settlement.  (Id. ¶ 79.)  The parties agree that for some period of time (when precisely is unclear), McVea arranged for storage of the equipment; defendants assert that this was part of the agreement McVea made in connection with the Project Equipment's sale to defendants.  (Id. ¶ 85.)  The parties also agree that throughout the relevant period, McVea continued to have access to the equipment.  (Id. ¶ 87.)

The parties agree that after August 31, 2012, Ford Graham represented to Woodbury that the equipment had a fair market value in excess of the Development Costs.  (See id. ¶ 94.)  In 2014, Ford Graham told Woodbury that he had agreed to sell the equipment for $4 million and that the equipment had a value in excess of $11 million.  (Id. ¶ 97.)  At his deposition, Ford Graham provided nonspecific testimony regarding other potential buyers.  (See id. ¶ 100.)

A.   The Option Agreement

The following persons and entities are parties to the Option Agreement:

Cogent Offshore Ltd., Ginsters, Services and Investments Ltd., Greenhill Offshore Ltd., JMF Offshore Ltd., Nassau Media Ltd., Vulcan Minerals and Power Ltd., Vulcan Petroleum Resources Ltd., Vulcan Power Services Ltd., Vulcan Water Resources Ltd., and Westbridge Fuels Ltd. (the "Vulcan Parties"); John Woodbury, the Ford Graham Annuity Trust No. 1, Ford Graham Annuity Trust No. 2, Ford Graham Annuity Trust No. 3, Ford Graham Annuity Trust No. 4, Ford Graham Annuity Trust No. 5, Ford Graham Annuity Trust No. 6, and the Ford Graham Annuity Trust No. 7 (the "Graham Family Trusts"). (SOF ¶ 17.) Vulcan Energy and Vulcan Holdings—the two Vulcan entities that are parties to the Security Agreement—are not parties to the Option Agreement. (Compare SOF ¶ 17, with Compl. Ex. A at 1.)

The Option Agreement was signed on May 15, 2012, with an effective date of June 16, 2012. (Compl. Ex. B ("Option Agreement"), ECF No. 2-2.) The Option Agreement provided Woodbury with an option to participate in various investment opportunities described in Schedule A, attached to that agreement. (See Option Agreement ¶ 1.) The agreement further provides, "Schedule A shall be amended by the Vulcan Parties at the beginning of each calendar quarter during the term of this Agreement, commencing September 1, 2012. . . ." (Id.) Any option must be exercised within two years from the effective date of the Option Agreement. (Id. at ¶ 2.) As the language of this latter provision is key to the parties' dispute regarding this provision the Court quotes it more fully below:

> 2. Exercise of the Option. Woodbury, in his sole and
> absolute discretion, may exercise the Option one or more

times in respect of any Opportunity to Invest, each time by giving written notice of such exercise to the respective Vulcan Party and the respective Graham Family Trust, which notice must be given by Woodbury during the period from the Effective Date until 5:00 p.m. EST on the date two (2) years from the Effective Date (the "Option Term"). . . . If Woodbury does not exercise the Option in respect of an Opportunity to invest during the Option Term, the Option in respect of that Opportunity to Invest will automatically terminate and neither the Vulcan Parties nor any of the Graham Family Trusts, on the one hand, nor Woodbury, on the other hand, nor Woodberry, on the other hand, will have any other liability, obligation or duty to the other under this Agreement in respect of that Opportunity to invest. . . .

(Id. at ¶ 2.)

It is undisputed that Woodbury never provided written notice of his exercise of any Option during the Option Term.  By the terms of the Option Agreement, the Vulcan Parties to that agreement were required to amend "Schedule A" on October 1, 2012, and every quarter thereafter for the following two years.  (Id. ¶ 22.)  The Vulcan Parties concede that they did not amend the Schedule A as required, but assert that they nevertheless provided plaintiff with extensive information on each investment opportunity.  (SOF ¶ 23.)  Plaintiff has not contested that such information was provided but argues that defendants' alleged failure to provide "formal Schedule A amendments" is "all that is required for Plaintiff to be entitled to summary judgment."  (Pl. Reply Br. at 14, 13, ECF No. 73.)

III.     RELEVANT LEGAL PRINCIPLES

      A.     <u>Standard of Review</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  When the moving party does not bear the ultimate burden on a particular claim or issue, it need only "point to the absence of evidence to support an essential element of the non-moving party's claim." <u>Brady v. Town of Colchester</u>, 863 F.2d 205, 211 (2d Cir. 1988).

In making a determination on summary judgment, a court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." <u>Dickerson v. Napolitano</u>, 604 F.3d 732, 740 (2d Cir. 2010).  Once the moving party has discharged its burden, the opposing party must set out specific facts showing a genuine issue of material fact for trial. <u>Wright v. Goord</u>, 554 F.3d 225, 266 (2d. Cir. 20009).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." <u>Hicks v. Baines</u>, 593 F.3d 159, 166 (2d Cir. 2010) (internal citations and quotation marks omitted).  In addition, "[o]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." <u>Porter</u>

v. Quarantillo, 722 F.3d 94, 97 (2d Cir. 2013) (internal quotation marks and citation omitted).

Only disputes relating to material facts—i.e., "facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").  The Court should not accept evidence presented by the nonmoving party that is so "blatantly contradicted by the record . . . that no reasonable jury could believe it[.]"  Scott v. Harris, 550 U.S. 372, 380 (2007); see also Zellner v. Summerlin, 494 F.3d 344, 371 (2d Cir. 2007) ("Incontrovertible evidence relied on by the moving party . . . should be credited by the court on [a summary judgment] motion if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party.").

A court may grant summary judgment in favor of a non-moving party sua sponte when the parties have been fully and fairly heard on an issue and "so long as the losing party was on notice that it had to come forward with all of its evidence." Garanti Finansai Kiralama A.S. v. Aqua Marino and Trading Inc., 697 F.3d 59, 64 (2d Cir. 2012) (internal citation omitted); see also Coach Leatherware Co, v, AnnTaylor, Inc., 933 F.2d 162, 167 (2d Cir. 1991).

11

B.    <u>Breach of Contract</u>

Under New York law, the elements of a breach of contract claim are: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." <u>Johnson v. Nextel Commc'ns Inc.</u>, 660 F.3d 131, 142 (2d Cir. 2011); <u>see also</u> <u>Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.</u>, 375 F.3d 168, 177 (2d Cir. 2004).

C.    <u>Fraud</u>

Plaintiff has asserted claims for both common law fraud and fraudulent inducement.

1.    <u>Common Law Fraud</u>

"The elements of fraud are a misrepresentation or a material omission of fact which was known to be false by the defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or omission, and injury[.]" <u>VisionChina Media Inc. v. S'holder Representative Servs., LLC</u>, 967 N.Y.S.2d 338, 343 (App. Div. 1st Dep't 2013).

2.    <u>Fraudulent Inducement</u>

A claim of fraudulent inducement under New York law requires plaintiffs to allege: "'(1) that the defendant made a representation, (2) as to a material fact, (3) which was false, (4) and known to be false by the defendant, (5) that the representation was made for the purpose of inducing the other party to rely upon it, (6) that the other party rightfully did so rely, (7) in ignorance of its falsity (8) to his injury.'" <u>Eaves v. Designs for Fin., Inc.</u>, 785 F. Supp. 2d 229, 246 (S.D.N.Y. 2011) (quoting <u>Computerized Radiological Servs. v. Syntex Corp.</u>, 786 F.2d 72, 76 (2d

12

Cir. 1986)).

        3.      Fraud Claims Overlapping with Contract Claims

"It is black letter law in New York that a claim for common law fraud will not lie if the claim is duplicative of a claim for breach of contract[.]" EQT Infrastructure Ltd. v. Smith, 861 F. Supp. 2d 220, 233 (S.D.N.Y. 2012) (citations omitted); see also Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996) (requiring that a fraud claim raised in a case stemming from a breach of contract be "sufficiently distinct from the breach of contract claim") (citation omitted).

In Bridgestone/Firestone, the Second Circuit identified three situations in which a plaintiff may bring a fraud action after a defendant makes "intentionally-false statements . . . indicating [an] intent to perform under the contract." 98 F.3d at 19-20. A "plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." Id. (internal citations omitted). With respect to collateral or extraneous fraudulent misrepresentations, "New York distinguishes between a promissory statement of what will be done in the future that gives rise only to a breach of contract cause of action and a misrepresentation of a present fact that gives rise to a separate cause of action for fraudulent inducement." Merrill Lynch & Co v. Allegheny Energy, Inc., 500 F.3d 171, 184 (2d Cir. 2007) (citations omitted);

Crabtree v. Tristar Auto. Grp., Inc., 776 F. Supp. 155, 163 (S.D.N.Y. 1991) (explaining that generally, a "representation that performance will be made, even if only implied through the negotiation process, is not distinct from the contract," but that there is an exception "if the promise made was a representation of present fact, not future intent") (citations omitted).

"Where courts have found viable fraud claims based on fraudulent misrepresentation, the statements concerned matters separate and distinct from the subject matter of the contract." MCI World Commc'ns, Inc. v. N. Am. Commc'ns Control, Inc., No. 98 Civ. 6818, 2003 WL 21279446, at *9 (S.D.N.Y. June 4, 2003); see also id. (discussing various cases and dismissing plaintiff's fraudulent misrepresentation claim because "[t]he misrepresentations . . . are closely related to the subject matter of the contract and concern representations of future intent, not a separate, present fact").

IV.    DISCUSSION

As stated above, defendants have conceded liability as to the breach of the Security Agreement. As to this claim, the only remaining issue is one of damages. As discussed below, the undisputed facts require denial of plaintiff's motion as to Count Two, for breach of the Option Agreement, and Count Three, for fraudulent inducement. Moreover, as the parties have been fully heard on these two claims, judgment is entered for defendants with regard to them. However, the Court finds that there are triable issues of fact with regard to Count Four, the fraud claim relating to conduct following defendants' breach of the Security Agreement.

14

A.    The Option Agreement

The language of the Option Agreement is clear and unambiguous: It required plaintiff to provide "written notice" of his intent to exercise an option within the two-year Option Term.  (Compl. Ex. B at ¶ 2.)  It is undisputed that he failed to do so.  While it is also undisputed that defendants did not provide plaintiff with the contractually required amendments to Schedule A, (SOF ¶ 23), that failure did not relieve plaintiff of his obligation to provide the required notice.  If plaintiff viewed the failure to provide the amended schedules as material to his decision whether to exercise an option, it behooved him to raise that prior to the expiration of the Option Term.  There is no evidence in the record that he did so.  Further, once the Option Term expired, the contract was at an end.  The breach that plaintiff here asserts is therefore one as to which no relief can be granted.

As plaintiff failed to provide required contractual notice, his claim for breach must fail.

B.    Fraud Claims

Plaintiff asserts two different fraud claims: Count Three, that while the parties were negotiating the Security Agreement Ford Graham made various false representations to plaintiff, including that Vulcan Energy or one of the Graham Entities was the owner of the Project Equipment, that he or one of the Graham Entities had clear title, and that the market value of the Project Equipment was approximately $4 million; and Count Four, that after defendants had failed to fulfill their repayment obligation under the Security Agreement, Ford Graham made a

number of false statements to plaintiff in order to prevent seizure of the equipment. (Compl. at 11-13.)  The former claim fails but the latter must go to trial.

      1.   <u>Common Law Fraud</u>

Plaintiff and defendants disagree as to a number of facts pertinent to resolution of the fraudulent misrepresentation claim.  In sum, if plaintiff were able to prove at trial that Ford Graham prevented seizure of the Project Equipment by making intentionally false statements as to a sale, plaintiff may be able to establish liability.  There are disputed issues of fact necessary to resolution of this question, including what statements were made, whether they were false, and whether in making any statements Ford Graham had the requisite scienter.  This claim must therefore go to trial.

The Court notes two important additional points.  First, there are many entities apparently included as defendants in this claim.  It is not at all clear to the Court that this claim can stand as to any defendant other than Ford Graham personally.  However, as defendant has not moved separately as to other defendants, this issue will be left for another day (but the Court will require that it be cleaned up prior to trial).

Second, the Court notes that even if plaintiff is able to prove liability as to Count Four, recoverable damages must be based on damage demonstrably attributable to diminution in the equipment's value following the date when payment was due (August 31, 2012)—and therefore tied to the alleged post-contractual fraud. The parties should consider whether there is any proof of damage

given such guidance.  If there is not, the parties should bring that fact to the Court's attention.

          2.   <u>Fraudulent Inducement</u>

In order for this Court to grant plaintiff's motion for summary judgment on Count Three, there must not be a triable issue of fact on any of the following: that defendants made one or more false representations of material fact, known to the defendant to be false, made for the purpose of inducing plaintiff' reliance, upon which plaintiff rightfully relied, and which induced plaintiff to enter into the Security Agreement, to his injury.  <u>Computerized Radiological Servs.</u>, 786 F.2d at 76.  In this regard, plaintiff has focused on the representations of the defendant-parties to the Security Agreement: (1) that they were the sole owners of the equipment, and held clear title free of any liens, claims, or encumbrances; and (2) that the value of the equipment was in excess of the principal amount of the loan (that is, the Development Costs).  (Pl. Brief in Support at 19-20, 23, ECF No. 71.)

As an initial matter, Count Three is directed solely at Graham (which the Court interprets as Ford Graham personally only) and Vulcan Energy.  The claim is not directed at any of the other defendants.  The Court notes that in all events the only possible defendants with regard to this claim would be the parties to the Security Agreement.  The host of other defendants joined in this action are not parties to that agreement or alleged to have been involved in the purported fraud.

The most problematic aspect of plaintiff's claim of fraudulent inducement regards the timing and damages.  In order to sustain a claim for fraudulent

17

inducement, plaintiff must prove damage.  <u>Computerized Radiological Servs.</u>, 786 F.2d at 76.  Here, the funds plaintiff provided to defendants were provided almost entirely prior to the execution of the Security Agreement.  Schedule I to that agreement lists the amounts and dates of funds provided.  (Compl. Ex. A at Sch. 1.) All but the last two payments were made prior to the date on which the defendants signed the contract, and all were provided prior to the date plaintiff signed.  (<u>See id.</u>)

But there are additional infirmities.  Even if this Court accepted that defendants made false representations regarding ownership and lien, defendants have proffered sufficient evidence to rebut an inference of scienter.  (SOF ¶¶ 66, 70-76.)  Moreover, even assuming falsity and scienter, plaintiff has failed to show how he could have been damaged by the representations.  This is first because, as discussed <u>supra</u>, almost all the funds were provided prior to defendants making any such representations—and, therefore, plaintiff could not have been relying on them.

The Court turns next to the representation regarding the Project Equipment's value.  First, the integration clause in the Security Agreement renders oral statements and emails provided during negotiations or otherwise irrelevant. (Compl. Ex. A ¶ 5.3.)  Under New York law it is clear that a fraud claim will not lie for a routine breach of contract.  <u>Bridgestone/Firestone</u>, 98 F.3d at 20.  Here, the breach of the rep and warranty—assuming for purposes of this point that it has been breached—is no more than that.  When plaintiff executed a Security

Agreement that contained the integration clause, he was agreeing to forego arguments regarding his reliance on pre-contract discussions.

But in addition, plaintiff has not proffered how he was damaged as a result of such representations. Again, at the time the contract was executed, virtually all of the Development Costs had been incurred.  (Compl. Ex. A at Sch. 1.)

V.     CONCLUSION

For the reasons set forth above, the Court GRANTS summary judgment as to Count I and DENIES it as to all other counts.  This matter shall proceed to trial expeditiously.  **Trial will begin May 1, 2017, and is scheduled for three days.**

The Clerk of Court is directed to terminate the motions at ECF Nos. 69 and 70.

SO ORDERED.

Dated:        New York, New York
              January 13, 2017

 

_____
      KATHERINE B. FORREST
      United States District Judge